## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: PREMIUM ESCROW SERVICES, INC., DEBTOR | * | |
| * * * * * * | * | |
| PREMIUM OF AMERICA, LLC, | * | |
| Plaintiff | * | |
| v. | * | CASE NO. 02-2358 |
| William C. Sanchez, M.D. | * | CHAPTER 11 |
| and | * | Adv. Proc. No.: 04-10455 |
| William C. Sanchez, M.D., P.C. | * | |
| Defendants | * | |
| * * * * * * * * * * * * * | | |

## AFFIDAVIT OF FRANCIS P. DICELLO

I, Francis P. Dicello, being over the age of 21 years, have personal knowledge of, and am competent to testify to, the matters set forth herein. I hereby certify as follows:

1. I am a partner in the law firm of Reed Smith LLP. I am licensed to practice law in the United States Bankruptcy Court for the District of Columbia.

2. I served as Lead Counsel to the Official Committee of Unsecured Creditors of Premium Escrow Services, Inc. (the "Creditors Committee") in the procedurally consolidated and jointly administered bankruptcy cases of Beneficial Financial Services, Inc., Beneficial Funding Corp., Beneficial Services Corp., Beneficial Assurance, Ltd.,

and Premium Escrow Services, Inc. (collectively, "PES" or the "Debtor"), Case Nos. 02-2265 and 02-2358, in this Court.

3. I advised the Creditors Committee in connection with its formulation and filing of the First Amended Disclosure Statement (the "Disclosure Statement") and First Amended Plan of Reorganization (the "Plan") for PES.

4. The majority of the claims in the Premium Escrow Services case were filed by individuals (hereafter referred to as the "Investors") who believed that they had either: (a) purchased fractional interests in viaticated life insurance policies (the "Viatical Policies"); or (b) obtained contractual rights to receive certain death benefits commensurate with their pro-rata investment in the Viatical Policies. The interest of the individual Investors was never formally and specifically defined by the Court.

5. Prior to filing the Disclosure Statement and Plan, the Creditors Committee held several meetings to develop a strategy for administering the Viatical Policies and for funding the premiums to maintain the Viatical Policies in force. I participated in the meetings and advised the Creditors Committee regarding the strategy for any reorganization and steps necessary to assure continued funding of premiums.

6. During these Creditors Committee meetings, the Creditors Committee discussed the difficulties in implementing a plan that decentralized the administration of the Viatical Policies. Many of these discussions were documented in Reports from the Unsecured Creditors Committee, which were made available to the public on the Creditors Committee's website soon after the meetings were held. True and accurate copies of these reports posted on the website are attached as Exhibits 1-4. Each of these

reports was made at or near the time of the Creditors Committee meetings that the reports describe, was made by a person with knowledge or from information transmitted by a person with knowledge, was made and kept in the course of a regularly conducted business activity, and it was the regular practice of the Creditors Committee to make and post such reports.

7. Following is a summary of some of the challenges to reorganization that the Creditors Committee discussed at its meetings:

a. The Investors' interests in the proceeds of the Viatical Policies were usually held by four to ten or more individuals who lived in different parts of the country and did not know each other. There was a recognition that if investor rights in the policies were not pooled, collection and payment of premiums to keep the policies in force and administration of the policies would have been an administrative and financial nightmare. Absent the solution set forth in the Plan, each investor who had an interest in the proceeds of a particular policy would have needed to coordinate with other Investors assigned to that policy to ensure that all Investors paid their share of future premiums. Investors on each policy also would have needed to arrange for someone to administer that policy -- i.e., ensure premiums were paid, address concerns of the insurance company, track the health status of the viators, and process any claims for the proceeds upon maturity of the Viatical Policies. Moreover, in the event that one or more of the persons holding an interest in the policy did not have funds to pay their share of premiums when due, the other parties holding an interest in any policy would have needed to pay the remaining premiums or the policy would lapse.

b.  The Debtor's estate had no funds to continue to pay for future premiums or the ongoing administration of the Viatical Policies.

c.  None of the Investors was designated by the insurance companies as the owner or beneficiary of the Viatical Policies. Rather, in most cases, the insurance companies recognized PES as the owner and beneficiary of the policies.

d.  Many of the policies were several years past the anticipated maturity dates given to investors at the time they acquired their interests. As a result, many investors were older and less willing to undertake the problems of administration set forth herein.

8.  The Disclosure Statement filed by the Creditors Committee prior to confirmation explained these potential obstacles to successful reorganization. Section XIV(A) of the Disclosure Statement provides:

> One alternative is a plan which recognizes the individual interest in the death benefits, and pays to the Investors the proceeds from their individual interests upon the maturity of their Viatical Policy. As noted above, there are no funds in the estate with which to pay ongoing administration of the Viatical Policies or to pay premiums, and any such plan would likely require the Investors to make additional contributions in order to keep the policies in force. Another alternative would be to abandon the Viatical Policies to the Investors. However, because the Investors own only a fractional interest in indivisible policies, it would be necessary for the multiple Investors to reach some sort of agreement among themselves regarding monitoring of the Viatical Policy and making future premium payments. Finally, a plan could be proposed which treats the Investors as contractual creditors of PES, and asserts an ownership interest by PES in the Viatical Policies and death benefits. Should the court find that PES is the owner of the Viatical Policies, the ruling may have substantial adverse tax consequences for PES

4

which would substantially reduce the return to Investors as tax claims have priority under the Bankruptcy Code.

9. The Creditors Committee devised and proposed the Plan to address the many challenges to reorganization described above in the foregoing paragraphs. In proposing the Plan, the Creditors Committee principally was concerned with creating a structure for reorganization that would: (1) avoid adverse tax consequences; and (2) permit shared administration of the Viatical Policies by pooling the varying rights and obligations of all investors in a newly created entity, Premium of America, LLC ("POA"). The Creditors Committee believed that the Plan would result in the most equitable distribution of the assets of the estate.

10. The assignment of the Investors' litigation rights was an essential component of the Plan, served a valid business purpose and was consistent with the goal of having Investors assign all interests and duties related to the policies to the newly created entity. The Plan diffuses risk for all Investors by pooling all of the Investors' rights (e.g., to death benefits and litigation proceeds) and obligations (e.g., premium payments and administration responsibilities). Under the Plan, each Investor gains or loses from the efforts of POA according to the Investor's pro rata expected return on his or her investment. The major fear confronting the Investors was that the Debtor would run out of funds to pay premiums and that policies would lapse, resulting in a total loss of investments. While the Committee suspected that in some cases, fraud or other actions occurred that might warrant litigation, the Committee did not have time or adequate access to the Debtor's records to determine the merits of possible litigation on behalf of

Investors. The focus, at and prior to confirmation of a plan, was on establishing an overall structure to insure maintenance and administration of the policies. While future litigation, if determined feasible after a legal and a cost/benefit analysis, was recognized as an additional source of funds to meet the plan's proposed goals, its consideration was not viewed as the primary or even a reliable source of funding premiums and distributions, but rather was included as part of an overall transfer of investor interests for the common good in exchange for an LLC participation. In short, Investors were encouraged to assign all their rights in connection with the policies to insure enhanced premium protection and thus ultimately, recovery under the policies..

11. After the Court approved the Disclosure Statement, the Investors were given an opportunity to vote to approve or reject the Plan. Over 75% of the 4,500 Investors voted on the Plan, and of those that voted, over 99% accepted the Plan. This Court confirmed the Plan.

12. I believe that the Plan afforded all creditors, including the Investors, with the potential for the greatest realization on their claims and interests. In my view, the assignment of the Investors' litigation rights to POA was neither collusive nor improper, because the Investors were giving up all of their interests in specific Viatical Policies in exchange for ownership interests in POA. The Investors' litigation rights were just some of the many rights to be transferred to POA, and the transfer of litigation rights, although essential to the Plan, were incidental to the general transfer of all of the Investors' rights and obligations.

13. The assignment of the Investors' litigation rights was not to my knowledge instituted for the purpose of creating jurisdiction in the Bankruptcy Court over the Investors' claims.

[SIGNATURE PAGE TO FOLLOW]

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct to the best of my knowledge, information, and belief.

January 23, 2006
Date

Francis P. Dicello

## REPORT FROM THE UNSECURED CREDITORS COMMITTEE
## APRIL 15, 2003

The Committee has established this website as well as its toll free number (866-263-3015) in order to facilitate communication with the approximately 4,500 investor/creditors in the Premium Escrow Services, Inc. Chapter 11 bankruptcy case. The Committee was appointed on February 27, 2003 and in the short time it has been in existence it has hired Reed Smith LLP in Washington, D.C. as its counsel and has met on several occasions. Under the Bankruptcy Code, the Committee is empowered to investigate the acts, conduct, assets and liabilities of the company in Chapter 11 and to conduct such other investigations as may be necessary to determine whether a plan of reorganization is feasible and/or the best way to maximize recovery for the individuals it represents.

Although it has not had time to conduct a thorough investigation, it appears that none of the policies have lapsed and that premiums are being paid on existing policies. The committee is monitoring the operations of the debtor and will exert its best efforts to insure that none of the policies lapse during the Chapter 11 process. The Court has required that the management of Premium segregate and hold until further order, the proceeds from any matured policy. You will see under the icon for *Court Documents* a motion filed by the Debtors to sell a portion of the interest claimed to be owned by Beneficial in a GE policy and the response filed on behalf of the Committee. That matter is now set for hearing on the 22nd of April. It is presently unclear as to whether the offer still exists. The Committee is also in the process of formulating a plan of reorganization which it will file independently or in conjunction with the plans for the other companies. It is contemplated that a Committee Plan will provide for a new entity to hold and supervise administration of the policies. As the work of the Committee progresses on those matters, reports will be given on this website. The Committee hopes to have its proposed plan ready for filing in the next few weeks.

Although there has been a motion to extend the time for filing claims, the Court has not yet entered an extension of the April 28, 2003 deadline. Further information on filing proofs of claims and sample forms are available under the *Forms* icon of this website.

Finally, there is a place on the home page marked *contact us*. If you have questions, please send them to us and the Chair of the Committee or his representative will make every effort to give you a prompt response.

                                                                        For the Committee:
                                                                       Francis P. Dicello
                                                                       Reed Smith, LLP
                                                                       Counsel



## SECOND REPORT FROM THE UNSECURED CREDITORS COMMITTEE
## MAY 15, 2003

Robert Del Collo asked to be relieved of his duties as Chair of the Creditors' Committee for personal reasons. Ira C. Rigger has been elected as Chair and Robert Del Collo will serve as Vice Chair.

On April 22, 2003, the Bankruptcy Court granted the Motion of the Unsecured Creditors' Committee extending the deadline for filing Proofs of Claim against Premium Escrow Services, Inc. and the other Beneficial entities to, and including, May 28, 2003.

The Committee has met several times over the past month and continues to work on the formulation of a Plan of Reorganization and Disclosure Statement. At the same time, the Committee has been working with the management of the Debtor companies to ensure that adequate funds are available to pay necessary administration expenses and premiums until the end of July 2003, by which time the Committee hopes to have a Court-approved Plan of Reorganization that will make provision for continuing premium payments.

Last week, the Committee and the Debtor filed a Joint Motion to settle certain claims brought by the Unsecured Creditors' Committee in connection with the GE Policy and to borrow from existing matured, but undistributed, policies in the sum of $825,000 to ensure that remaining premiums and administrative expenses can be paid through July 2003. Copies of the Motion seeking to settle the GE claim and to borrow funds are posted in the "Selected Documents" portion of this website. A review those documents will give you a greater understanding of the Committee's claims against Beneficial arising from its acquisition of the GE Policy and the need to borrow funds to ensure premiums are timely paid during the reorganization process.

While the Committee is still working on a proposed Plan of Reorganization and, thus, final decisions have not yet been made, the Committee is leaning strongly to filing a Plan that will pool all of the policies and make distribution to all investor/creditors periodically from matured funds after adequate reserves are withheld to cover anticipated future premiums and expenses of administration. The nature of the interest held by each investor/creditor, who acquired an interest in a viatical policy now held by Premium Escrow Services, Inc., is somewhat ambiguous. There are approximately 500 policies. The investor/creditor interests, with respect to these policies, are usually held by 4-10 or more individuals who do not know each other. Beneficial has no funds to continue to paying premiums due in the future. None of the investor/creditors are designated as beneficiaries by the insurance company. Premium Escrow Services, Inc. is, in most cases, the beneficiary recognized by the insurance company. If Premium Escrow Services, Inc. was determined to have no interest in the policies, each investor/creditor who acquired an interest in the proceeds would have to coordinate with the other investor/creditors who acquired an interest in the proceeds of a particular policy and ensure that each investor/creditor paid his share of future premiums. Investor/creditors on each policy would also have to arrange for someone to administer that policy, making sure premiums were paid, any concerns of the insurance company were addressed, and any claim for proceeds on the death of the viator was properly processed. In the event one or more of the persons holding an interest in the policy did not have funds to pay their share of premiums when due, the other parties holding an interest in


EXHIBIT 2

any insurance proceeds would have to come up with the missing funds or the policy could lapse. For those and other reasons, the Committee believes that pooling, as set forth above, will produce the best overall result for all of the investor/creditors by providing the best assurance that policies will not lapse, and maximizing and expediting a return to investor/creditors.

The Committee is also weighing various options with respect to future administration of these policies. It is likely that the Plan of Reorganization proposed by the Committee will provide for the establishment of a new corporation to hold and administer the policies that would be supervised by a Board of Managers (initially, the current members of the Unsecured Creditors' Committee). The Board of Managers would have the authority to hire individuals or contractors to perform necessary administrative services.

As stated in the previous Report, the Committee has not had an opportunity yet to examine in adequate detail all of the records of the Debtor companies. We are not aware, however, of any defaults with respect to existing policies. The Committee is optimistic that it will be able to quickly present a Plan of Reorganization which, if accepted by the required number of investor/creditors and approved by the Bankruptcy Court, should result over time in a return of all funds invested by investor/creditors as well as a significant portion of the anticipated profit.

In accordance with established bankruptcy process, the Committee will soon file a Plan of Reorganization and Disclosure Statement. A Disclosure Statement is a lengthy document that will provide a description of the Plan of Reorganization and background information that will hopefully allow you to intelligently evaluate and vote with respect to the Plan of Reorganization proposed by the Committee. A Disclosure Statement is initially reviewed by the Bankruptcy Court for sufficiency. This process, under Bankruptcy Court Rules, takes almost a month. Once approved by the court, the Disclosure Statement, Plan of Reorganization and Ballots will be submitted to each of the investor/creditors for approval or rejection. The Court normally holds a hearing to act on the proposed Plan about 3 weeks to a month after the ballots go out.

Over the past few weeks, our counsel, who is listed on the website, has received numerous calls from individual investor/creditors and brokers. The Committee represents all of the investor/creditors and we welcome the opportunity to hear your concerns and thoughts as we develop a reorganization plan, as well as on other aspects of the case. Your input is valuable to us as we attempt to resolve this matter in a manner that is fair and equitable, and that will maximize the return to each of the investor/creditors. We will keep you informed by means of supplemental reports on this website as we move forward. Relevant documents will also be posted under the "Selected Documents" icon on our website.

                                                              Ira C. Rigger
                                                              Committee Chair

June 18, 2003

To Owners of Viaticals Being Held by Premium Escrow Services, Inc.:

Your Creditors Committee has filed with the Bankruptcy Court a Disclosure Statement and Plan of Reorganization, both of which are available on this web site. The Plan provides that all Viatical Owners will exchange their interests in the Viatical Policies for interests in a new company, Premium LLC. That new company's sole reason to exist will be to administer the policies and made distributions to you as an Investors.

The contribution of interests in the Viatical Policies and the creation of Premium LLC will allow Investors to receive distributions on a regular basis, regardless of whether or not their individual policies have matured. In addition, and of equal importance, the pooling of the policies will provide a source of funding to pay operating expense, keep premiums current and distribute all remaining funds to the Investors.

Where Investors do not consent to becoming members of Premium LLC, the Plan provides that their interests in the Viatical Policies will be deemed transferred to Premium Liquidating Trust (the "Trust"). The Trust will then contribute the interests to Premium LLC and it will become a member in the limited liability company. Investors who do not execute a consent form will be beneficiaries of the Trust and will receive distributions from the Trust in proportion to their death benefit interest. The establishment of the Trust was necessary because membership in a limited liability company requires affirmative consent. While distributions from Premium LLC and the Trust will be similar, the Trust will have an additional set of administrative expenses, and therefore distributions to the beneficiaries are expected to be somewhat lower than those received by the Premium LLC Members. **You do not have to take any action at this time.**

The Court has set a hearing on the Disclosure Statement for June 27, 2003. At the hearing, the Court will rule on whether the Disclosure Statement provides Investors with sufficient information to allow the Investors to vote to accept or reject the Plan, and will set a deadline by which ballots must be received. Assuming the Court approves the Disclosure Statement, each Investor will be sent a package containing the approved Disclosure Statement, a copy of the Plan, a ballot and a summary of the Plan. A hearing is set for July 29, 2003 for the Court to act on the confirmation of the Plan. We will keep you updated on any changes to either the Disclosure Statement and Plan.

Ira Rigger, Chairman

EXHIBIT 3

August 6, 2003

*IN RE PREMIUM ESCROW SERVICES, INC., CASE NO. 02-2358*

TO THE VIATICAL INVESTORS OF PREMIUM ESCROW SERVICES, INC.

As you are probably aware, the Creditors' Committee appointed in Premium Escrow Services, Inc. proposed a plan of reorganization (the "Plan") in the bankruptcy case pending in the Bankruptcy Court for the District of Columbia. A hearing was held on August 5, 2003 at which time, the Bankruptcy Court confirmed the Plan based on the overwhelming acceptance of the Plan by the Investors. (Over 75% of the 4,500 Investors voted on the Plan, and of those that voted, over 99% accepted the Plan.)

The Plan provides for among other things, the creation of Premium of Maryland LLC. (Originally, the new entity was to be named "Premium LLC" but this name was not available; the name will likely be changed within a week and the new Board will advise you of this name change.) Initially, the Board of Managers for Premium of Maryland LLC will be comprised of the following individuals: Ira Rigger (president), Frank Sullivan, Larry Wiley, Leslie Stipek, Heidi Cohen, Mary LeVigne, Robert Del Collo, and Marc Albert (trustee for Premium Trust).

Due in large part to the hard work of the new Board, Premium of Maryland LLC will be operational within a few days. Once the company is running, we will provide you with updated contact information. In the meantime, the website, http://premiumescrow.uniscribe.net and "800-number", 866-263-3015 will continue to provide updated information. Additionally, the email address, premiumescrow@reedsmith.com is also available to correspond with the Board.

The Plan also provides for the pooling of interests in viatical contracts, and provides investors with two options. One option allows investors to become members of Premium of Maryland LLC. The other option provides for the interest in the investment to be held in a trust, Premium Trust, which will be a member of Premium of Maryland LLC. Depending on the rate of maturity of the policies and the amount of funds available, it is anticipated that distributions will be made semi-annually to both the Members and beneficiaries of the Trust. While the majority of investors consented to become members of Premium of Maryland LLC, the new Board will send out an additional mailing shortly to those investors that did not consent in order to give them an opportunity to become Members of Premium of Maryland LLC.

We hope that you are pleased with the outcome of the Bankruptcy Case. We look forward to serving you.


EXHIBIT