## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: PREMIUM ESCROW
SERVICES, INC., DEBTOR                          *

*      *      *      *      *      *      *

PREMIUM OF AMERICA, LLC,                        *

    Plaintiff                                  *

       v.                                  *

William C. Sanchez, M.D.                        *        CASE NO. 02-2358
                                                        CHAPTER 11
    and                                        *
                                                        Adv. Proc. No.: 04-10455
William C. Sanchez, M.D., P.C.                  *

    Defendants                                 *

*    *    *    *    *    *    *    *    *    *    *    *    *

## RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Plaintiff Premium of America, LLC ("POA"), through counsel, Paul S. Caiola, David G. Sommer, and Gallagher Evelius & Jones LLP, hereby files this response in opposition to Defendants' Motion to Dismiss Investor-Related Claims for Lack of Subject Matter Jurisdiction Or, In the Alternative, for Severance of All Investor-Related Claims (the "Motion to Dismiss") filed by Defendants William C. Sanchez, M.D., and William C. Sanchez, M.D., P.C. (collectively, "Defendants").

EXHIBIT

C

## INTRODUCTION

Defendants contend, without support, that POA obtained the claims in this proceeding "improperly or collusively." The success of their motion rests entirely on this fallacious and unsupported claim. As explained below, POA's claims were not obtained improperly, but rather were assigned as an integral part of the carefully crafted plan of reorganization confirmed by this Court. The assignment of the claims served a valid business purpose and did not occur solely for the purpose of obtaining the jurisdiction of this Court. Because the assignment was proper and any proceeds of the litigation will benefit all of the estate's creditors, this litigation will directly impact the implementation and execution of the plan of reorganization. Consequently, POA has standing to assert the claims, and subject matter jurisdiction rests with this Court.

## BACKGROUND

### A.    Beneficial's Viatical Settlement Business And Defendants' Role In The Business

As a viatical settlement company, Beneficial Assurance, Ltd., Premium Escrow Services, Inc. ("PES"), and their affiliates (collectively, "Beneficial") were engaged in the business of promoting the sales of interests in life insurance policies owned by terminally ill patients and other insureds, known as "viators." First Amended Complaint ("Complaint") at ¶ 9. Beneficial established a network of brokers and companies who directed viators to Beneficial. *Id.* Beneficial solicited investors through its selling agents located throughout the United States, and these investors placed money with Beneficial

based upon promised returns to be derived from matured life insurance policies (i.e., upon the death of the viator). *Id.*

Defendants were retained by Beneficial to evaluate the life expectancy of certain viators, and these life expectancy evaluations were an integral part of the viatical settlement process. Complaint at ¶s 20, 33-35. A market for viatical settlements exists only if a policy insures the life of a person who is expected to die, due to terminal illness or advanced age, within a relatively short period of time (i.e., four years or less). *Id.* at ¶ 33. Investing in the death benefits of an insurance policy covering the life of a young healthy person simply is not an attractive investment opportunity. *Id.* Thus, when marketing viatical settlements, Beneficial made representations about the estimated life expectancy of the subject viator. *Id.*

The estimated life expectancy is also an important factor in determining the value of a viatical settlement. Complaint at ¶ 34. Specifically, a shorter life expectancy results in a higher sales price for the policy. *Id.* For example, an investor would be willing to pay substantially more for a life insurance policy with a face value of $1,000,000 if the death benefit were likely to be paid in one or two years than if the death benefit would likely not be paid for several years. *Id.*

Beneficial distributed marketing materials to potential investors that provided details of how the viatical settlement process worked. Complaint at ¶ 35. In these materials, Beneficial described Dr. Sanchez as an "independent" physician and provided a copy of his curriculum vitae. *Id.* The Beneficial materials explained that the information from viators "is gathered, collated and sent" to a physician for his

"independent review." *Id.* The materials further related that a life expectancy is "independently verified" and projected for the viator "[b]ased solely" on the physician's evaluation. *Id.* The materials included the resumes of two evaluating physicians, including Dr. Sanchez. *Id.*

Dr. Sanchez is generally familiar with the viatical settlement process, and he knew that Beneficial, PES, and Beneficial's investors (hereafter, the "Investors") would rely on the life expectancy evaluations he provided. Complaint at ¶ 36. Beneficial and PES justifiably relied on Dr. Sanchez's opinions in determining whether and at what price to bid on a policy. *Id.* at ¶ 37. Moreover, in deciding whether to invest in viatical policies, the Investors justifiably relied on the representations in Beneficial's marketing materials concerning the medical reviews and life expectancy evaluations provided by Defendants. *Id.*

Pursuant to his agreement with Beneficial, Dr. Sanchez reviewed and evaluated the medical records of numerous viators who had the HIV virus over a period of more than two years, and provided life expectancy projections on the lives of these viators. Complaint at ¶ 38. Dr. Sanchez was paid a fee for each evaluation, and earned a significant sum performing these evaluations during this period. *Id.*

## B. Bankruptcy Proceedings And Plan Of Reorganization

By May of 2003, because most of the viators had lived well beyond their projected life expectancies (some by many years), the funds in Beneficial's premium reserve account were depleted, prompting the bankruptcy filing by several related entities,

including Beneficial Assurance, Ltd. and PES.  Complaint at ¶s 14-15.  This Court entered an order directing the procedural consolidation and joint administration of these cases on June 26, 2003, Case Nos. 02-2265 and 02-2358.  *Id.* at ¶ 16.

An Official Committee of Unsecured Creditors of Premium Escrow Services, Inc. (the "Creditors Committee") was formed to represent the interests of PES's unsecured creditors, principally the Investors.  Affidavit of Francis P. Dicello ("Dicello Affidavit"), attached as Exhibit A, at ¶s 2, 4.  The Investors believed they had either:  (a) purchased fractional interests in viaticated life insurance policies (the "Viatical Policies"); or (b) obtained contractual rights to receive certain death benefits commensurate with their pro-rata investment in the Viatical Policies.  *Id.* at ¶ 4.

The Creditors Committee ultimately devised and filed a First Amended Disclosure Statement (the "Disclosure Statement") and First Amended Plan of Reorganization (the "Plan") for PES.  Dicello Affidavit, Exhibit A, at ¶ 3.  Prior to filing the Disclosure Statement and Plan, the Creditors Committee held several meetings to develop a strategy for administering the Viatical Policies and for funding the premiums to maintain the Viatical Policies in force.  *Id.* at ¶ 5.  Among the issues discussed by the Creditors Committee was the strategy for any reorganization and steps necessary to assure continued funding of premiums.  *Id.*

During these Creditors Committee meetings, the Creditors Committee discussed the difficulties in implementing a plan that decentralized the administration of the Viatical Policies.  Dicello Affidavit, Exhibit A, at ¶ 6.  Many of these discussions were documented in Reports from the Unsecured Creditors Committee, which were made

available to the public on the Creditors Committee's website soon after the meetings were held. *Id.* Following is a summary of some of the challenges to reorganization that the Creditors Committee discussed at its meetings:

a.      The Investors' interests in the proceeds of the Viatical Policies were usually held by four to ten or more individuals who lived in different parts of the country and did not know each other. Dicello Affidavit, Exhibit A, at ¶ 7.a. The Creditors Committee recognized that if investor rights in the policies were not pooled, it would be very difficult to collect and pay premiums to keep the policies in force, or to administer the policies, i.e., ensure premiums were paid, address concerns of the insurance company, track the health status of the viators, and process any claims for the proceeds upon maturity of the Viatical Policies. *Id.* Absent the solution set forth in the Plan, each investor who had an interest in the proceeds of a particular policy would have needed to coordinate with other Investors assigned to that policy to ensure that all Investors paid their share of future premiums. *Id.* Investors on each policy also would have needed to arrange for someone to administer that policy. *Id.* Moreover, in the event that one or more of the persons holding an interest in the policy did not have funds to pay their share of premiums when due, the other parties holding an interest in any policy would have needed to pay the remaining premiums or the policy would lapse. *Id.*

b.      The Debtor's estate had no funds to continue to pay for future premiums or the ongoing administration of the Viatical Policies. Dicello Affidavit, Exhibit A, at ¶ 7.b.

c.     None of the Investors was designated by the insurance companies as the owner or beneficiary of the Viatical Policies. Dicello Affidavit, Exhibit A, at ¶ 7.c. Rather, in most cases, the insurance companies recognized PES as the owner and beneficiary of the policies. *Id.*

d.     Many of the policies were several years past the anticipated maturity dates given to investors at the time they acquired their interests. Dicello Affidavit, Exhibit A, at ¶ 7.d. As a result, many investors were older and less willing to undertake the problems of administration described above. *Id.*

The Disclosure Statement filed by the Creditors Committee prior to confirmation explained these potential obstacles to successful reorganization. Dicello Affidavit, Exhibit A, at ¶ 8. Section XIV(A) of the Disclosure Statement provides:

> One alternative is a plan which recognizes the individual interest in the death benefits, and pays to the Investors the proceeds from their individual interests upon the maturity of their Viatical Policy. As noted above, there are no funds in the estate with which to pay ongoing administration of the Viatical Policies or to pay premiums, and any such plan would likely require the Investors to make additional contributions in order to keep the policies in force. Another alternative would be to abandon the Viatical Policies to the Investors.  However, because the Investors own only a fractional interest in indivisible policies, it would be necessary for the multiple Investors to reach some sort of agreement among themselves regarding monitoring of the Viatical Policy and making future premium payments. Finally, a plan could be proposed which treats the Investors as contractual creditors of PES, and asserts an ownership interest by PES in the Viatical Policies and death benefits. Should the court find that PES is the owner of the Viatical Policies, the ruling may have substantial adverse tax consequences for PES which would substantially reduce the return to Investors as tax claims have priority under the Bankruptcy Code.

The Creditors Committee devised and proposed the Plan to address the many challenges to reorganization. Dicello Affidavit, Exhibit A, at ¶ 9. In proposing the Plan, the Creditors Committee principally was concerned with creating a structure for reorganization that would: (1) avoid adverse tax consequences; and (2) permit shared administration of the Viatical Policies by pooling the varying rights and obligations of all investors in a newly created entity, POA. *Id.* The Creditors Committee believed that the Plan would result in the most equitable distribution of the assets of the estate. *Id.*

The assignment of the Investors' litigation rights was an essential component of the Plan, served a valid business purpose, and was consistent with the goal of having Investors assign all interests and duties related to the policies to the newly created entity. Dicello Affidavit, Exhibit A, at ¶ 10. The Plan diffuses risk for all Investors by pooling all of the Investors' rights (e.g., to death benefits and litigation proceeds) and obligations (e.g., premium payments and administration responsibilities). *Id.* Under the Plan, each Investor gains or loses from the efforts of POA according to the Investor's pro rata expected return on his or her investment. *Id.* The major fear confronting the Investors was that the Debtor would run out of funds to pay premiums and that Viatical Policies would lapse, resulting in a total loss of the investments. *Id.*

While the Creditors Committee suspected that certain acts of negligence or fraud might have occurred, the Committee did not have time or adequate access to the Debtor's records to determine the merits of possible litigation that could be filed on behalf of the Investors. Dicello Affidavit, Exhibit A, at ¶ 10. The focus prior to confirmation of the

Plan was on establishing an overall structure to insure maintenance and administration of the Viatical Policies. *Id.* While future litigation, if determined feasible on a cost/benefit analysis, was recognized as an additional source of funds to meet the Plan's proposed goals, its consideration was not viewed as the primary or even a reliable source of funding premiums and distributions, but rather was included as part of an overall transfer of investor interests for the common good in exchange for an LLC participation. *Id.* In short, Investors were asked to assign all their rights in connection with the policies to insure enhanced premium protection and thus ultimately, recovery under the Viatical Policies. *Id.*

After the Court approved the Disclosure Statement, the Investors were given an opportunity to vote to approve or reject the Plan. Dicello Affidavit, Exhibit A, at ¶ 11. Over 75% of the 4,500 Investors voted on the Plan, and of those that voted, over 99% accepted the Plan. *Id.* Thereafter, this Court confirmed the Plan. *Id.*

Counsel to the Creditors' Committee, Francis Dicello, believes the Plan afforded all creditors, including the Investors, with the potential for the greatest realization on their claims and interests. Dicello Affidavit, Exhibit A, at ¶ 12. Moreover, Mr. Dicello testified that the assignment of the Investors' litigation rights to POA was neither collusive nor improper, because the Investors were giving up all of their interests in specific Viatical Policies in exchange for ownership interests in POA. *Id.* The Investors' litigation rights were just some of the many rights to be transferred to POA, and the transfer of litigation rights, although essential to the Plan, was incidental to the general transfer of all of the Investors' rights and obligations. *Id.* Moreover, the assignment of

the Investors' litigation rights was not instituted for the purpose of creating jurisdiction in the Bankruptcy Court over the Investors' claims. *Id.* at ¶ 13.

### C.    Investigation And Filing Of Claims Against Defendants

Following confirmation of the Plan, POA conducted an investigation that lead it to the inescapable conclusion that Defendants' life expectancy evaluations were negligent and caused substantial harm to POA and its members. Specifically, POA discovered that Defendants' life expectancy evaluations were grossly inaccurate, and that most of the viators have lived far beyond their estimated life expectancies. Complaint at ¶ 39.

According to POA's data at the time it filed the Complaint, Defendants evaluated the life expectancies of 137 HIV-infected viators whose life insurance policies were viaticated by Beneficial. Complaint at ¶ 40. Of these viators, one hundred ten (110), or 80%, were still living. *Id.* On average, the viators assessed by Defendants had outlived their life expectancies to date by 43 months – more than 3-1/2 years. *Id.* The viators who are still alive had outlived Defendants' life expectancy projections to date by an average of 51 months - more than 4 years. *Id.*

Defendants projected that 31 viators would live only 0-12 months. Complaint at ¶ 41. Remarkably, however, at the time the Complaint was filed, 26 of those viators (84%) were still alive and had lived beyond Defendants' projections by an average of 77 months – nearly 6-1/2 years. *Id.*

In the year that has passed since the filing of the Complaint, these statistics and other evidence continue to indicate that Defendants were negligent in performing life

expectancy evaluations. Indeed, POA's expert witness, Joel E. Gallant, MD, MPH, an Associate Professor of Medicine at Johns Hopkins University, has opined that as of July of 1996, the development in the treatment of HIV-infected patients had advanced such that every physician who was knowledgeable about the treatment of HIV should have: (a) known that the life expectancy of HIV-infected patients could not be accurately projected; and (b) ceased making life expectancy evaluations for HIV-infected patients. *See* Exhibit B at ¶ 5. Yet all of Defendants' life expectancy evaluations were performed after this date, during the period from August 23, 1996 to January 6, 1999. *Id.* at ¶ 7.

Indeed, Dr. Gallant has also opined that "an HIV-infected person today, if adherent with therapy, can expect to live a full life span, ultimately dying of something other than AIDS." Exhibit B at ¶ 4. Based on this assessment, POA ceased paying premiums on policies viaticated by individuals infected with HIV. Affidavit of Robert Del Collo ("Del Collo Affidavit"), attached as Exhibit C, at ¶ 3. As premiums become due and are not paid, these policies will lapse. *Id.* Thus, Defendants' negligence will cause the entire investments made on these policies to be lost, which, according to POA's damages expert Charles A. Black, C.P.A., will result in damages to POA and its members in an amount exceeding $16 million. *Id.*

## STANDARD OF REVIEW

A motion to dismiss should not be granted "unless it appears beyond doubt that the [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil*, 20 F. Supp.2d 1, 4 (D.D.C. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The court must

presume that the plaintiff's factual allegations are true, and the plaintiff is "entitled to all favorable inferences which may be drawn from those allegations." *Id.* (citing *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Schuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## ARGUMENT

1.  **28 U.S.C. § 1359 Does Not Apply Because The Assignment Of Claims To POA Was Neither Improper Nor Collusive.**

Relying on 28 U.S.C. § 1359 ("Section 1359"), Defendants assert that the Court lacks jurisdiction over POA's claims because POA was assigned those claims improperly or collusively. Defendants' Memorandum at 8-12. Defendants provide no factual support for this claim of improper or collusive assignment. In fact, the Defendants' unsubstantiated contention is contrary to the record of the Bankruptcy Case and the testimony of the Creditors Committee's lead counsel. POA obtained full control of Investors' claims as part of a comprehensive strategy for reorganizing the Debtor's business and achieving maximum return to all creditors. Such a legitimate business purpose is neither "improper" nor "collusive" within the meaning of Section 1359.

Section 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. "This statutory language would seem by implication to give its blessing to assignments *not* collusively made to invoke federal jurisdiction." *Feinberg v. Katz*, 2005 WL 2990633, *9 (S.D.N.Y. 2005) (emphasis in original).

Although Section 1359 is ordinarily invoked where a party is challenging the federal court's subject matter jurisdiction for lack of diversity, a few courts have construed the statute in cases where a party has obtained "related to" jurisdiction under 28 U.S.C. § 1334. *See, e.g., Balzotti v. RAD Investments*, 273 B.R. 327, 331 (D.N.H. 2002).

Courts agree that Section 1359 does not apply to a proper assignment supported by adequate consideration, made for a valid business purpose, and where the assignor gives up control of the conduct of the litigation. *See, e.g., Drexel Burnham Lambert Group, Inc. v. Galadari*, 777 F.2d 877, 881 (2d Cir. 1985) (holding that, "because the assignment was for at least facially valid business purposes..., the district court did not err in finding that its jurisdiction was not invoked in a collusive fashion in violation of [Section 1359]"); *Transcontinental Oil Corp. v. Trenton Prods. Co.*, 560 F.2d 94, 110 (2d Cir. 1977) (upholding the District Court's determination that an assignment was not improper or collusive where "the party chosen to bring the suit is in fact the master of the litigation"); *Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic, Inc.*, 357 F. Supp.2d 911, 922-23 (E.D. Va. 2005); *In re CBI Holding Co., Inc.*, 311 B.R. 350, 364 (S.D.N.Y. 2004); *Balzotti*, 273 B.R. at 331; *Baker v. Latham Sparrowbush Assocs.*, 808 F. Supp. 992, 1002 (S.D.N.Y. 1992) (holding that assignment was not improper or collusive because it was made "for a legitimate business purpose unconnected with the creation of [federal] jurisdiction").

In *Balzotti*, 273 B.R. at 331, for example, the court held that Section 1359 did not apply where a trustee brought state law claims that had been assigned to it for adequate

consideration.    The court explained that the trustee had obtained the assignment in exchange for "valuable concessions concerning the timing of the hearing on the confirmed Plan" and that "the court did not identify any countervailing evidence suggesting that the [assignors] granted the assignment in an effort to manufacture jurisdiction in the bankruptcy court." *Id.*

In *Long & Foster*, 357 F. Supp.2d at 922-23, 58 real estate agents assigned Long & Foster Real Estate, Inc. ("Long & Foster") state law claims for commissions owed by a separate real estate brokerage firm ("Pardoe"). In exchange for the assignment and for giving up control of the litigation, Long & Foster reimbursed the agents the exact amount that each agent believed he or she was due from Pardoe. Long & Foster initially filed the claims against Pardoe in state court, but after they were dismissed on procedural grounds, Long & Foster brought the claims in federal court on the basis of diversity of citizenship. Invoking Section 1359, Pardoe challenged the court's subject matter jurisdiction.

The *Long & Foster* court analyzed the circumstances of the assignments and concluded that they "were not 'improperly or collusively made' to invoke federal jurisdiction." *Id.* at 924. The court reasoned that: (1) the agents received adequate consideration for the assignment by receiving the exact amount they believed they were owed; (2) there was a legitimate business reason for the assignment, "namely to induce the 58 individual agents to commence employment, as a collective group, with Long & Foster"; and (3) the real estate agents no longer exercised any control over the litigation.

In *In re CBI Holding Co., Inc.*, 311 B.R. at 364, the debtor, pursuant to a Chapter 11 plan of reorganization, assigned to a disbursing agent, BSI, the right to pursue all

claims. The plan of reorganization also effected the assignment to BSI of all claims held

by a certain creditor, TCW, in exchange for a waiver of claims against TCW and an

agreed allowed claim in the bankruptcy case. *Id*. at 357. Pursuant to the assignments,

BSI filed in the bankruptcy court an adversary proceeding alleging claims formerly held

by the debtor and TCW. *Id*. at 358. In rejecting the notion that BSI had obtained TCW's

claims for the purpose of manufacturing federal jurisdiction, the court stated:

> TCW's claims became property of Debtor's estate under the
> Plan. Although the claims were deemed "transferred and
> assigned" to BSI, BSI was acting solely as disbursing agent
> for Debtors under the Plan. The assignment to BSI in these
> circumstances was equivalent to an assignment to the estate.
> This assignment was not effected solely for the purpose of
> manufacturing jurisdiction over this adversary proceeding...,
> but was effected as an integral part of the Plan, which was
> approved by the bankruptcy court and over which the
> bankruptcy court retained jurisdiction.

*Id*. at 364 (emphasis added).

Even the cases cited by Defendants support the proposition that assignments for

adequate consideration or for legitimate business purposes do not fall within the meaning

of Section 1359. *See In re Maislin Indus., U.S., Inc.*, 66 B.R. 614 (E.D. Mich. 1986);

*Design for Business Interiors, Inc. v. Herson's, Inc.*, 659 F. Supp. 1103 (D.D.C. 1986).

In *Maislin*, the debtor brought claims in the bankruptcy court against Van Houten. 66

B.R. at 614-15. The court proposed findings of fact and conclusions of law

recommending that the claims be dismissed because Maislin Transport, Ltd. ("MTL"),

not the debtor, had not contracted with Van Houten. *Id*. at 615. After the court issued the

proposed findings, MTL assigned its claims against Van Houten to the debtor. The court

held that the assignment was "obviously made to enable the claim to be brought in the bankruptcy case" considering that the plaintiffs "essentially admitted that the assignment was made in direct response to [the bankruptcy judge's] recommendation that the adversary proceeding be dismissed on the grounds that the debtors were not the contracting parties" and that the "assignment recites a consideration of $1." *Id.* at 616.

In *Design for Business Interiors*, 659 F. Supp. at 1109, the assignor "nominally transferred" the litigation rights to the plaintiff. Under the assignment agreement, the assignor was "to get the full amount of recovery" from the litigation, "was empowered to make litigation and settlement decisions, and most importantly reserve[d] the right to cancel the [assignment] agreement." *Id.* The court held that Section 1359 barred the court from hearing the case because the assignment was "merely colorable, with no substance underlying it."

In contrast to *Maislin* and *Design for Business Interiors*, the circumstances here clearly show that the assignments were not made for the purpose of manufacturing federal jurisdiction. Rather, like in *Long & Foster*, when the Investors assigned their litigation rights, they gave up all control over decisions regarding litigation. The Investors retained only an indirect interest in the litigation proceeds through any distribution from POA. Moreover, contrary to Defendants assertion, the Investors who had claims to assign are not the only persons who will benefit from POA's litigation against Defendants. There are more than 4,500 members of POA and less than 25% of those members were direct victims of the Defendants' negligence. Del Collo Affidavit,

Exhibit C, at ¶ 2. Under the Plan, however, all of POA's members will share pro rata in the benefits of the litigation proceeds. Dicello Affidavit, Exhibit A, at ¶ 10.

Also like *Long & Foster* and unlike *Maislin*, the Investors were provided with adequate consideration for the assignments. Under the Plan, the Investors obtained membership interests in POA and rights to the proceeds of any distributions resulting from matured Viatical Policies in which they previously had no interest. Dicello Affidavit, Exhibit A, at ¶ 10.

The Investors' assignments, like those at issue in *In re CBI Holding Co.*, served a valid business purpose as an integral part of the Debtor's reorganization. Dicello Affidavit, Exhibit A, at ¶s 9-11. The assignments were necessary to achieve the Creditors Committee's goal of sharing the administration of the Viatical Policies by pooling the Investors' varying rights and obligations in POA. *Id.* at ¶ 9. The assignments also allowed all Investors to gain (through enhanced premium protection and pro rata distributions) from the litigation proceeds obtained from the rights of action held and assigned by only a fraction of the Investors. *Id.* at ¶ 10; Del Collo Affidavit, Exhibit C, at ¶ 2.

Defendants' arguments are particularly specious here because Defendants failed to provide any evidence in support of their claim of improper or collusive assignment and instead rely only on their bald allegations and conclusory statements. The fact that the assignment occurred does not alone permit the conclusion that Section 1359 applies or that POA obtained its claims solely to manufacture federal jurisdiction. *Belcufine v. Aloe*, 112 F.3d 633, 637 (3d Cir. 1997) (upholding the District Court's finding of federal

17

jurisdiction, where the party invoking Section 1359 alleged without any evidence and "in conclusory fashion that the ... claim ... was pretextual and was asserted solely in order to create federal jurisdiction"). Had Defendants conducted even a cursory investigation into this matter, they would have discovered that the assignment of claims to POA was not accomplished solely to obtain federal jurisdiction. *See* Dicello Affidavit, Exhibit A, at ¶s 6-8.

Nevertheless, Defendants assert that the Investors assigned their claims to escape the class certification requirements of Bankruptcy Rule 7023 and Fed. R. Civ. P. 23. This allegation is not supported by the Reports of the Creditors Committee or the Disclosure Statement, which contain no discussion of class action requirements or the consequences of litigating in bankruptcy court. Dicello Affidavit, Exhibit A, at Exhibit 1-4. Simply stated, the suggestion that POA obtained the Investors' claims to avoid the prerequisites of certification contradicts the evidence.

Because the assignment of the Investors' claims against Defendants served a legitimate business purpose and did not occur for the sole purpose of manufacturing jurisdiction in federal court, the assignments were valid and do not fall within the reach of Section 1359. The Court, therefore, has subject matter jurisdiction to preside over POA's claims.

### 2.    The Court Has Subject Matter Jurisdiction Because This Proceeding Is "Related To" The Bankruptcy Case.

Defendants argue that the Court lacks subject matter jurisdiction under 28 U.S.C. § 1334 ("Section 1334") because POA's claims are not arising under Bankruptcy Code or

arising in or related to the bankruptcy case. Defendants' Memorandum at 12-16. This claim misses the mark. This Court, by virtue of its determination that this is a core proceeding, already entered an order establishing that this proceeding arose in the bankruptcy case. However, even if this proceeding has not arisen in the bankruptcy case, this Court still has jurisdiction because the claims are "related to" the bankruptcy case under Section 1334(b). Because POA, the reorganized debtor, has asserted claims that have been properly assigned to it by certain Investors, any proceeds realized from those claims will go directly to POA and will have an obvious impact on the recovery of its members, the creditors of the former PES estate.

Section 1334(b) provides:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

"The statutory grant of 'related to' jurisdiction is quite broad." *In re Boston Regional Medical Center, Inc.*, 410 F.3d 100, 105 (1st Cir. 2005). The test for whether a proceeding is "related to" a case under title 11 is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re U.S. Office Prods. Co. Securities Litigation*, 313 B.R. 73, 80 (D.D.C. 2004) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984)); *accord In re Hughes*, 98 B.R. 115, 118 (D.D.C. 1988). "Thus, bankruptcy courts ordinarily may exercise related to jurisdiction as long as the outcome of the litigation 'potentially [could] have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities,

options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankruptcy estate.'" *In re Boston Regional Medical Center, Inc.*, 410 F.3d at 105 (quoting *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (quoting *In re Smith*, 866 F.2d 576, 580 (3d Cir. 1989))).[1]

Here, certain Investors' claims have been properly assigned to POA for the valid purpose of achieving the purposes of the Plan -- maximum recovery and equitable distribution for all Investors. Dicello Affidavit, Exhibit A, at ¶ 9. The litigation proceeds will be applied to pay future premiums on Viatical Policies and/or will be distributed pro rata to all of POA's members. *Id.* at ¶ 10. The Investors who possessed claims against Defendants only comprise a portion of POA's membership population. And, contrary to Defendants' unsubstantiated allegation, the Investors who assigned claims to POA are not the only creditors of PES who will benefit from the litigation; the remaining members of POA will benefit pro rata from the litigation proceeds as well. *Id.* Because any proceeds from the claims necessarily will expand the Investors' recoveries through POA's pro rata distributions, the claims have an impact on the implementation and execution of the Plan and are, therefore, "related to" the bankruptcy case. Accordingly, this Court has jurisdiction over this proceeding pursuant to Section 1334(b).

---

[1] In passing, Defendants refer to the Court's jurisdiction as it relates to post-confirmation proceedings. Defendants' Memorandum at 14. Defendants do not argue that the Court lacks subject matter jurisdiction based on the reach of the Court's post-confirmation jurisdiction, however, so POA has not addressed this issue. In the event Defendants claim in their reply memorandum that this Court lacks subject matter jurisdiction because this case was filed post-confirmation, POA will seek an opportunity to brief that issue in a surreply.

### 3.    POA Has Standing To Assert The Claims Properly Assigned From The Investors.

Defendants contend that POA has no standing to assert the claims assigned to it by the Investors because those claims do not "belong" to the estate.    Defendants' Memorandum at 16-21. The merits of this contention again depend on the validity of the assignment of the Investors' claims to POA.  As explained above (*supra* at 12-18), the Investors' assignments of claims were valid.  As a result, the claims became property of POA for the benefit of all creditors, and POA has standing to assert the claims in this proceeding.  Accordingly, Defendants' arguments fail.

Defendants have identified but misapplied the case that is directly on point: *In re Bogdan*, 414 F.3d 507 (4th Cir. 2005).  In *Bogdan*, the Fourth Circuit held that a Chapter 7 trustee to whom several creditors assigned their causes of action had standing to assert those causes of action for the benefit of all creditors.  *Id.* at 512.  The assignors in *Bogdan* were mortgage lenders who allegedly suffered losses caused by a real estate "flipping scheme" orchestrated by the debtor and numerous third parties.  *Id.* at 509.  In assigning their state-law claims to the trustee, the mortgage lenders gave up control of the litigation and any direct benefit from the proceeds.  *Id.* at 509-10.  Under the assignment, the mortgage lenders would recover, "if at all, only as creditors of the estate on a pro rata basis." *Id.*

The Fourth Circuit analyzed the standing issue in light of the Supreme Court's opinion in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972).  In *Caplin*, the Supreme Court denied standing to a trustee who filed an action on behalf of certain

creditors in the absence of any assignment of claims by those creditors to the trustee. The Supreme Court held that the trustee in *Caplin* had no standing because: (1) the bankruptcy laws did not contain a provision allowing a trustee to sue on behalf of creditors; (2) the creditors and not the trustee should have the authority to make litigation decisions; and (3) the outcome of the litigation could lead to inconsistent verdicts because the creditors would not be bound by the judgment in the trustee's action. *Id.* at 428, 431-32.

The *Bogdan* court distinguished *Caplin*, concluding that the assignment at issue in *Bogdan* eliminated the reasons for the Supreme Court's refusal to grant standing in *Caplin*. First, in *Bodgan*, the trustee did not assert any cause of action directly on the creditors' behalf but rather had obtained the claims by virtue of the creditors' unconditional assignment. The creditors who assigned the claims would receive nothing from the litigation except a pro rata distribution shared with all other creditors. *Bogdan*, 414 F.3d at 511-12. Second, the mortgage lenders in *Bogdan* abandoned their claims altogether and allowed the trustee to assume full control of the litigation on behalf of the estate. *Id.* at 512. Finally, the potential for inconsistent outcomes in the litigation did not exist, as the mortgage lenders had unconditionally assigned their claims and relinquished all right to seek recovery directly against the defendants. *Id.*

Resolving these same issues in the context of Chapter 11 cases, other courts have reached conclusions consistent with the Fourth Circuit's in *Bogdan. See, e.g., In re Agribiotech, Inc.*, 319 B.R. 207, 214 (D. Nev. 2004) (distinguishing *Caplin* and holding that plan-created creditors' trust in Chapter 11 case had standing to pursue fraud claims

assigned to it by certain creditors, where assignors would recover from the litigation only through a pro rata distribution under the plan); *In re Southwest Supermarkets, L.L.C.,* 315 B.R. 565, 571 (Bankr. D. Ariz. 2004) (distinguishing *Caplin* and holding that Chapter 11 Trustee had standing to assert claims assigned by secured creditors who relinquished full control of the litigation and who will recover from the claims along with other creditors pursuant to the plan).

Here, as in *Bogdan,* the Investors unconditionally assigned their claims to POA and relinquished full control of the conduct of the litigation. Plan at § 7.2. The proceeds realized from the litigation will not benefit only the Investors who assigned the claims. Rather, as described in Section B above, they will be shared among all Investors according to the pro rata distributions made by POA and the premiums paid on all Viatical Policies. Dicello Affidavit, Exhibit A, at ¶ 10. Contrary to Defendants' claim, the Investors who assigned their claims against Defendants constitute less than 25% of the total pool of Investors. Del Collo Affidavit, Exhibit C, at ¶ 2. In fact, the great majority of the Viatical Policies owned by POA were viaticated based on the life expectancy evaluations performed by other persons. *Id.* Consequently, while most of the Investors did not assign to POA claims against Defendants, all Investors will realize benefits from the litigation proceeds on a pro rata basis along with the Investors who were harmed by Defendants and assigned their claims.

In addition, because the Investors gave up full control of their claims against Defendants, they will be bound by any judgment obtained against Defendants, leaving no risk of inconsistent litigation outcomes. By making the unconditional assignment, the

Investors also abandoned the ability to make litigation decisions, including the decisions to settle or release the claims. The claims against Defendants are property of POA, which accordingly has standing to assert them in this proceeding.

## CONCLUSION

For the foregoing reasons, POA respectfully requests that the Court deny Defendants' Motion to Dismiss.

Respectfully submitted,

Dated: January 23, 2006

      /s/ David G. Sommer
Paul S. Caiola, Federal Bar #23940
David G. Sommer, Federal Bar #27581
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

Attorneys for Plaintiff Premium of
America, LLC

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 23rd day of January, 2006, service of the foregoing Response in Opposition to Defendants' Motion to Dismiss was made by electronic service upon the following parties:

> Brian J. Nash
> Michael Sanders
> Nash & Associates, LLC
> Cromwell Center, Suite 201
> 809 Gleneagles Court
> Towson, Maryland 21286
> (410) 321-6660
>
> Alan M. Grochal
> Stephen M. Goldberg
> Tydings & Rosenberg, LLP
> 100 East Pratt Street, 26th Floor
> Baltimore, Maryland 21202
> (410) 752-9700

> _____/s/_____
> David G. Sommer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:  PREMIUM ESCROW
SERVICES, INC., DEBTOR                                      *

*       *       *       *       *       *       *

PREMIUM OF AMERICA, LLC,                                    *

    Plaintiff                                              *

       v.                                                  *

William C. Sanchez, M.D.                                    *       CASE NO. 02-2358
                                                                   CHAPTER 11

    and                                                    *       Adv. Proc. No.: 04-10455

William C. Sanchez, M.D., P.C.                             *

    Defendants                                             *

*       *       *       *       *       *       *       *       *       *       *       *       *

## AFFIDAVIT OF FRANCIS P. DICELLO

    I, Francis P. Dicello, being over the age of 21 years, have personal knowledge of, and am competent to testify to, the matters set forth herein.  I hereby certify as follows:

    1.    I am a partner in the law firm of Reed Smith LLP.  I am licensed to practice law in the United States Bankruptcy Court for the District of Columbia.

    2.    I served as Lead Counsel to the Official Committee of Unsecured Creditors of Premium Escrow Services, Inc. (the "Creditors Committee") in the procedurally consolidated and jointly administered bankruptcy cases of Beneficial Financial Services, Inc., Beneficial Funding Corp., Beneficial Services Corp., Beneficial Assurance, Ltd.,

and Premium Escrow Services, Inc. (collectively, "PES" or the "Debtor"), Case Nos. 02-2265 and 02-2358, in this Court.

3.    I advised the Creditors Committee in connection with its formulation and filing of the First Amended Disclosure Statement (the "Disclosure Statement") and First Amended Plan of Reorganization (the "Plan") for PES.

4.    The majority of the claims in the Premium Escrow Services case were filed by individuals (hereafter referred to as the "Investors") who believed that they had either: (a) purchased fractional interests in viaticated life insurance policies (the "Viatical Policies"); or (b) obtained contractual rights to receive certain death benefits commensurate with their pro-rata investment in the Viatical Policies. The interest of the individual Investors was never formally and specifically defined by the Court.

5.    Prior to filing the Disclosure Statement and Plan, the Creditors Committee held several meetings to develop a strategy for administering the Viatical Policies and for funding the premiums to maintain the Viatical Policies in force. I participated in the meetings and advised the Creditors Committee regarding the strategy for any reorganization and steps necessary to assure continued funding of premiums.

6.    During these Creditors Committee meetings, the Creditors Committee discussed the difficulties in implementing a plan that decentralized the administration of the Viatical Policies. Many of these discussions were documented in Reports from the Unsecured Creditors Committee, which were made available to the public on the Creditors Committee's website soon after the meetings were held. True and accurate copies of these reports posted on the website are attached as Exhibits 1-4. Each of these

2

reports was made at or near the time of the Creditors Committee meetings that the reports describe, was made by a person with knowledge or from information transmitted by a person with knowledge, was made and kept in the course of a regularly conducted business activity, and it was the regular practice of the Creditors Committee to make and post such reports.

      7.    Following is a summary of some of the challenges to reorganization that the Creditors Committee discussed at its meetings:

      a.    The Investors' interests in the proceeds of the Viatical Policies were usually held by four to ten or more individuals who lived in different parts of the country and did not know each other. There was a recognition that if investor rights in the policies were not pooled, collection and payment of premiums to keep the policies in force and administration of the policies would have been an administrative and financial nightmare. Absent the solution set forth in the Plan, each investor who had an interest in the proceeds of a particular policy would have needed to coordinate with other Investors assigned to that policy to ensure that all Investors paid their share of future premiums. Investors on each policy also would have needed to arrange for someone to administer that policy -- i.e., ensure premiums were paid, address concerns of the insurance company, track the health status of the viators, and process any claims for the proceeds upon maturity of the Viatical Policies. Moreover, in the event that one or more of the persons holding an interest in the policy did not have funds to pay their share of premiums when due, the other parties holding an interest in any policy would have needed to pay the remaining premiums or the policy would lapse.

3

b.    The Debtor's estate had no funds to continue to pay for future premiums or the ongoing administration of the Viatical Policies.

c.    None of the Investors was designated by the insurance companies as the owner or beneficiary of the Viatical Policies. Rather, in most cases, the insurance companies recognized PES as the owner and beneficiary of the policies.

d.    Many of the policies were several years past the anticipated maturity dates given to investors at the time they acquired their interests. As a result, many investors were older and less willing to undertake the problems of administration set forth herein.

8.    The Disclosure Statement filed by the Creditors Committee prior to confirmation explained these potential obstacles to successful reorganization. Section XIV(A) of the Disclosure Statement provides:

> One alternative is a plan which recognizes the individual interest in the death benefits, and pays to the Investors the proceeds from their individual interests upon the maturity of their Viatical Policy. As noted above, there are no funds in the estate with which to pay ongoing administration of the Viatical Policies or to pay premiums, and any such plan would likely require the Investors to make additional contributions in order to keep the policies in force. Another alternative would be to abandon the Viatical Policies to the Investors.    However, because the Investors own only a fractional interest in indivisible policies, it would be necessary for the multiple Investors to reach some sort of agreement among themselves regarding monitoring of the Viatical Policy and making future premium payments. Finally, a plan could be proposed which treats the Investors as contractual creditors of PES, and asserts an ownership interest by PES in the Viatical Policies and death benefits. Should the court find that PES is the owner of the Viatical Policies, the ruling may have substantial adverse tax consequences for PES

4

which would substantially reduce the return to Investors as tax claims have priority under the Bankruptcy Code.

9.     The Creditors Committee devised and proposed the Plan to address the many challenges to reorganization described above in the foregoing paragraphs.    In proposing the Plan, the Creditors Committee principally was concerned with creating a structure for reorganization that would: (1) avoid adverse tax consequences; and (2) permit shared administration of the Viatical Policies by pooling the varying rights and obligations of all investors in a newly created entity, Premium of America, LLC ("POA").    The Creditors Committee believed that the Plan would result in the most equitable distribution of the assets of the estate.

10.     The assignment of the Investors' litigation rights was an essential component of the Plan, served a valid business purpose and was consistent with the goal of having Investors assign all interests and duties related to the policies to the newly created entity.    The Plan diffuses risk for all Investors by pooling all of the Investors' rights (e.g., to death benefits and litigation proceeds) and obligations (e.g., premium payments and administration responsibilities).    Under the Plan, each Investor gains or loses from the efforts of POA according to the Investor's pro rata expected return on his or her investment. The major fear confronting the Investors was that the Debtor would run out of funds to pay premiums and that policies would lapse, resulting in a total loss of investments. While the Committee suspected that in some cases, fraud or other actions occurred that might warrant litigation, the Committee did not have time or adequate access to the Debtor's records to determine the merits of possible litigation on behalf of

5

Investors. The focus, at and prior to confirmation of a plan, was on establishing an overall structure to insure maintenance and administration of the policies. While future litigation, if determined feasible after a legal and a cost/benefit analysis, was recognized as an additional source of funds to meet the plan's proposed goals, its consideration was not viewed as the primary or even a reliable source of funding premiums and distributions, but rather was included as part of an overall transfer of investor interests for the common good in exchange for an LLC participation. In short, Investors were encouraged to assign all their rights in connection with the policies to insure enhanced premium protection and thus ultimately, recovery under the policies..

11.    After the Court approved the Disclosure Statement, the Investors were given an opportunity to vote to approve or reject the Plan. Over 75% of the 4,500 Investors voted on the Plan, and of those that voted, over 99% accepted the Plan. This Court confirmed the Plan.

12.    I believe that the Plan afforded all creditors, including the Investors, with the potential for the greatest realization on their claims and interests. In my view, the assignment of the Investors' litigation rights to POA was neither collusive nor improper, because the Investors were giving up all of their interests in specific Viatical Policies in exchange for ownership interests in POA. The Investors' litigation rights were just some of the many rights to be transferred to POA, and the transfer of litigation rights, although essential to the Plan, were incidental to the general transfer of all of the Investors' rights and obligations.

13.    The assignment of the Investors' litigation rights was not to my knowledge instituted for the purpose of creating jurisdiction in the Bankruptcy Court over the Investors' claims.

[SIGNATURE PAGE TO FOLLOW]

I solemnly affirm under the penalties of perjury that the contents of the foregoing

Affidavit are true and correct to the best of my knowledge, information, and belief.

_Jan 23, 2006_
Date

Francis P. Dicello

## REPORT FROM THE UNSECURED CREDITORS COMMITTEE
### APRIL 15, 2003

The Committee has established this website as well as its toll free number (866-263-3015) in order to facilitate communication with the approximately 4,500 investor/creditors in the Premium Escrow Services, Inc. Chapter 11 bankruptcy case. The Committee was appointed on February 27, 2003 and in the short time it has been in existence it has hired Reed Smith LLP in Washington, D.C. as its counsel and has met on several occasions. Under the Bankruptcy Code, the Committee is empowered to investigate the acts, conduct, assets and liabilities of the company in Chapter 11 and to conduct such other investigations as may be necessary to determine whether a plan of reorganization is feasible and/or the best way to maximize recovery for the individuals it represents.

Although it has not had time to conduct a thorough investigation, it appears that none of the policies have lapsed and that premiums are being paid on existing policies. The committee is monitoring the operations of the debtor and will exert its best efforts to insure that none of the policies lapse during the Chapter 11 process. The Court has required that the management of Premium segregate and hold until further order, the proceeds from any matured policy. You will see under the icon for *Court Documents* a motion filed by the Debtors to sell a portion of the interest claimed to be owned by Beneficial in a GE policy and the response filed on behalf of the Committee. That matter is now set for hearing on the 22nd of April. It is presently unclear as to whether the offer still exists. The Committee is also in the process of formulating a plan of reorganization which it will file independently or in conjunction with the plans for the other companies. It is contemplated that a Committee Plan will provide for a new entity to hold and supervise administration of the policies. As the work of the Committee progresses on those matters, reports will be given on this website. The Committee hopes to have its proposed plan ready for filing in the next few weeks.

Although there has been a motion to extend the time for filing claims, the Court has not yet entered an extension of the April 28, 2003 deadline. Further information on filing proofs of claims and sample forms are available under the *Forms* icon of this website.

Finally, there is a place on the home page marked *contact us.* If you have questions, please send them to us and the Chair of the Committee or his representative will make every effort to give you a prompt response.

For the Committee:
Francis P. Dicello
Reed Smith, LLP
Counsel

**SECOND REPORT FROM THE UNSECURED CREDITORS COMMITTEE**
**MAY 15, 2003**

Robert Del Collo asked to be relieved of his duties as Chair of the Creditors' Committee for personal reasons. Ira C. Rigger has been elected as Chair and Robert Del Collo will serve as Vice Chair.

On April 22, 2003, the Bankruptcy Court granted the Motion of the Unsecured Creditors' Committee extending the deadline for filing Proofs of Claim against Premium Escrow Services, Inc. and the other Beneficial entities to, and including, May 28, 2003.

The Committee has met several times over the past month and continues to work on the formulation of a Plan of Reorganization and Disclosure Statement. At the same time, the Committee has been working with the management of the Debtor companies to ensure that adequate funds are available to pay necessary administration expenses and premiums until the end of July 2003, by which time the Committee hopes to have a Court-approved Plan of Reorganization that will make provision for continuing premium payments.

Last week, the Committee and the Debtor filed a Joint Motion to settle certain claims brought by the Unsecured Creditors' Committee in connection with the GE Policy and to borrow from existing matured, but undistributed, policies in the sum of $825,000 to ensure that remaining premiums and administrative expenses can be paid through July 2003. Copies of the Motion seeking to settle the GE claim and to borrow funds are posted in the "Selected Documents" portion of this website. A review those documents will give you a greater understanding of the Committee's claims against Beneficial arising from its acquisition of the GE Policy and the need to borrow funds to ensure premiums are timely paid during the reorganization process.

While the Committee is still working on a proposed Plan of Reorganization and, thus, final decisions have not yet been made, the Committee is leaning strongly to filing a Plan that will pool all of the policies and make distribution to all investor/creditors periodically from matured funds after adequate reserves are withheld to cover anticipated future premiums and expenses of administration. The nature of the interest held by each investor/creditor, who acquired an interest in a viatical policy now held by Premium Escrow Services, Inc., is somewhat ambiguous. There are approximately 500 policies. The investor/creditor interests, with respect to these policies, are usually held by 4-10 or more individuals who do not know each other. Beneficial has no funds to continue to paying premiums due in the future. None of the investor/creditors are designated as beneficiaries by the insurance company. Premium Escrow Services, Inc. is, in most cases, the beneficiary recognized by the insurance company. If Premium Escrow Services, Inc. was determined to have no interest in the policies, each investor/creditor who acquired an interest in the proceeds would have to coordinate with the other investor/creditors who acquired an interest in the proceeds of a particular policy and ensure that each investor/creditor paid his share of future premiums. Investor/creditors on each policy would also have to arrange for someone to administer that policy, making sure premiums were paid, any concerns of the insurance company were addressed, and any claim for proceeds on the death of the viator was properly processed. In the event one or more of the persons holding an interest in the policy did not have funds to pay their share of premiums when due, the other parties holding an interest in



any insurance proceeds would have to come up with the missing funds or the policy could lapse. For those and other reasons, the Committee believes that pooling, as set forth above, will produce the best overall result for all of the investor/creditors by providing the best assurance that policies will not lapse, and maximizing and expediting a return to investor/creditors.

The Committee is also weighing various options with respect to future administration of these policies. It is likely that the Plan of Reorganization proposed by the Committee will provide for the establishment of a new corporation to hold and administer the policies that would be supervised by a Board of Managers (initially, the current members of the Unsecured Creditors' Committee). The Board of Managers would have the authority to hire individuals or contractors to perform necessary administrative services.

As stated in the previous Report, the Committee has not had an opportunity yet to examine in adequate detail all of the records of the Debtor companies. We are not aware, however, of any defaults with respect to existing policies. The Committee is optimistic that it will be able to quickly present a Plan of Reorganization which, if accepted by the required number of investor/creditors and approved by the Bankruptcy Court, should result over time in a return of all funds invested by investor/creditors as well as a significant portion of the anticipated profit.

In accordance with established bankruptcy process, the Committee will soon file a Plan of Reorganization and Disclosure Statement. A Disclosure Statement is a lengthy document that will provide a description of the Plan of Reorganization and background information that will hopefully allow you to intelligently evaluate and vote with respect to the Plan of Reorganization proposed by the Committee. A Disclosure Statement is initially reviewed by the Bankruptcy Court for sufficiency. This process, under Bankruptcy Court Rules, takes almost a month. Once approved by the court, the Disclosure Statement, Plan of Reorganization and Ballots will be submitted to each of the investor/creditors for approval or rejection. The Court normally holds a hearing to act on the proposed Plan about 3 weeks to a month after the ballots go out.

Over the past few weeks, our counsel, who is listed on the website, has received numerous calls from individual investor/creditors and brokers. The Committee represents all of the investor/creditors and we welcome the opportunity to hear your concerns and thoughts as we develop a reorganization plan, as well as on other aspects of the case. Your input is valuable to us as we attempt to resolve this matter in a manner that is fair and equitable, and that will maximize the return to each of the investor/creditors. We will keep you informed by means of supplemental reports on this website as we move forward. Relevant documents will also be posted under the "Selected Documents" icon on our website.

Ira C. Rigger
Committee Chair

June 18, 2003

To Owners of Viaticals Being Held by Premium Escrow Services, Inc.:

Your Creditors Committee has filed with the Bankruptcy Court a Disclosure Statement and Plan of Reorganization, both of which are available on this web site. The Plan provides that all Viatical Owners will exchange their interests in the Viatical Policies for interests in a new company, Premium LLC. That new company's sole reason to exist will be to administer the policies and made distributions to you as an Investors.

The contribution of interests in the Viatical Policies and the creation of Premium LLC will allow Investors to receive distributions on a regular basis, regardless of whether or not their individual policies have matured. In addition, and of equal importance, the pooling of the policies will provide a source of funding to pay operating expense, keep premiums current and distribute all remaining funds to the Investors.

Where Investors do not consent to becoming members of Premium LLC, the Plan provides that their interests in the Viatical Policies will be deemed transferred to Premium Liquidating Trust (the "Trust"). The Trust will then contribute the interests to Premium LLC and it will become a member in the limited liability company. Investors who do not execute a consent form will be beneficiaries of the Trust and will receive distributions from the Trust in proportion to their death benefit interest. The establishment of the Trust was necessary because membership in a limited liability company requires affirmative consent. While distributions from Premium LLC and the Trust will be similar, the Trust will have an additional set of administrative expenses, and therefore distributions to the beneficiaries are expected to be somewhat lower than those received by the Premium LLC Members. **You do not have to take any action at this time.**

The Court has set a hearing on the Disclosure Statement for June 27, 2003. At the hearing, the Court will rule on whether the Disclosure Statement provides Investors with sufficient information to allow the Investors to vote to accept or reject the Plan, and will set a deadline by which ballots must be received. Assuming the Court approves the Disclosure Statement, each Investor will be sent a package containing the approved Disclosure Statement, a copy of the Plan, a ballot and a summary of the Plan. A hearing is set for July 29, 2003 for the Court to act on the confirmation of the Plan. We will keep you updated on any changes to either the Disclosure Statement and Plan.

Ira Rigger, Chairman

EXHIBIT
3

August 6, 2003

*IN RE PREMIUM ESCROW SERVICES, INC., CASE NO. 02-2358*

TO THE VIATICAL INVESTORS OF PREMIUM ESCROW SERVICES, INC.

As you are probably aware, the Creditors' Committee appointed in Premium Escrow Services, Inc. proposed a plan of reorganization (the "Plan") in the bankruptcy case pending in the Bankruptcy Court for the District of Columbia. A hearing was held on August 5, 2003 at which time, the Bankruptcy Court confirmed the Plan based on the overwhelming acceptance of the Plan by the Investors. (Over 75% of the 4,500 Investors voted on the Plan, and of those that voted, over 99% accepted the Plan.)

The Plan provides for among other things, the creation of Premium of Maryland LLC. (Originally, the new entity was to be named "Premium LLC" but this name was not available; the name will likely be changed within a week and the new Board will advise you of this name change.) Initially, the Board of Managers for Premium of Maryland LLC will be comprised of the following individuals: Ira Rigger (president), Frank Sullivan, Larry Wiley, Leslie Stipek, Heidi Cohen, Mary LeVigne, Robert Del Collo, and Marc Albert (trustee for Premium Trust).

Due in large part to the hard work of the new Board, Premium of Maryland LLC will be operational within a few days. Once the company is running, we will provide you with updated contact information. In the meantime, the website, http://premiumescrow.uniscribe.net and "800-number", 866-263-3015 will continue to provide updated information. Additionally, the email address, premiumescrow@reedsmith.com is also available to correspond with the Board.

The Plan also provides for the pooling of interests in viatical contracts, and provides investors with two options. One option allows investors to become members of Premium of Maryland LLC. The other option provides for the interest in the investment to be held in a trust, Premium Trust, which will be a member of Premium of Maryland LLC. Depending on the rate of maturity of the policies and the amount of funds available, it is anticipated that distributions will be made semi-annually to both the Members and beneficiaries of the Trust. While the majority of investors consented to become members of Premium of Maryland LLC, the new Board will send out an additional mailing shortly to those investors that did not consent in order to give them an opportunity to become Members of Premium of Maryland LLC.

We hope that you are pleased with the outcome of the Bankruptcy Case. We look forward to serving you.



EXHIBIT

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:  PREMIUM ESCROW
SERVICES, INC., DEBTOR     *

\*   \*   \*   \*   \*   \*    *

PREMIUM OF AMERICA, LLC,    *

   Plaintiff        *

     v.        *

William C. Sanchez, M.D.     *    CASE NO. 02-2358
              CHAPTER 11

   and         *    Adv. Proc. No.: 04-10455

William C. Sanchez, M.D., P.C.    *

   Defendants       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## EXPERT REPORT OF
## JOEL E. GALLANT, MD, MPH

I, Joel E. Gallant, MD, MPH, hereby submit this Expert Report on behalf of Plaintiff Premium of America, LLC ("POA").

In rendering the opinions described herein, I have reviewed documents concerning life expectancy evaluations provided by William C. Sanchez, M.D. ("Dr. Sanchez") in connection with viatical settlements conducted by Beneficial Financial Services, Inc. t/a Beneficial Assistance, and its affiliates.  Specifically, I have reviewed the following documents:


EXHIBIT
B

a.    Complaint filed by POA against Dr. Sanchez and William C. Sanchez, M.D., P.C.;

b.    Medical records relating to 13 viators infected with HIV for which Dr. Sanchez provided life expectancy evaluations.

c.    Written life expectancy evaluations for 147 viators infected with HIV for which Dr. Sanchez provided life expectancy evaluations.

All of the opinions described herein are based on my knowledge, training, and experience as a physician specializing in HIV, and on my review of the documents described above.    Each opinion described in paragraphs 1-7 below is made to a reasonable degree of medical certainty:

1.    In late 1995 and early 1995, scientists began to report dramatic results from early studies involving a new class of anti-HIV drugs known as protease inhibitors. In July of 1996, at the International AIDS Conference in Vancouver, B.C., these findings were confirmed in several large studies.  Levels of HIV virus were able to be suppressed to undetectable levels, which resulted in dramatic improvements and even complete recovery of immune function as measured by CD4 lymphocytes.  Dr. David Ho became *Time Magazine*'s "Man of the Year" after he announced that HIV might be curable using combinations of protease inhibitors and other anti-HIV drugs, and magazines such as *Time* and *Newsweek* featured prominent cover stories speculating on whether the AIDS epidemic was over.   The promise of these new drugs was also widely reported in mainstream newspapers including the *New York Times* and *USA Today*.

2.    Of course, HIV infection did not turn out to be curable, and the epidemic is not over. However, the new drugs lived up to their promise. By 1997, it was clear that the disease had changed dramatically. AIDS wards emptied, mortality rates plummeted, AIDS hospices closed their doors, and AIDS home care companies went bankrupt. Patients who had been waiting for death began going back to work.

3.    In one large study of HIV-infected outpatients reported in *The New England Journal of Medicine*, the proportion of patients for whom any antiviral therapy was prescribed increased from 72 percent of patients in 1994 to 95 percent by June 1997. During this same period, the proportion of these patients who received a prescription of combination regimens increased from 25 percent to 94 percent. Even more dramatic, the rate of use in this patient population of regimens containing protease inhibitors increased from 2 percent in mid-1995 to 82 percent by June 1997. This study also showed death rates decreasing from 29.4 per 100 person-years in 1995 to 16.7 per 100 person-years in 1996 to 8.8 per 100 person-years by the second quarter of 1997.

4.    Since that time, HIV therapy has improved steadily, and treatment options have both expanded and simplified. HIV infection is now acknowledged to be a treatable chronic disease not unlike diabetes or hypertension, and most experts believe that an HIV-infected person today, if adherent with therapy, can expect to live a full life span, ultimately dying of something other than AIDS.

5.    Given the development in the treatment of HIV-infected patients described above, every physician who was knowledgeable about such treatment should have, by

July of 1996: (a) known that the life expectancy of HIV-infected patients could no longer be accurately projected; and (b) ceased making life expectancy evaluations for HIV-infected patients.

6.    Moreover, physicians who were not HIV/AIDS experts or knowledgeable about the treatment of HIV-infected patients as of July of 1996 were not qualified to make life expectancy projections for these patients. Nevertheless, given the publicity described above in paragraph 1, even general practitioners without expertise in infectious diseases should have been aware by July of 1996 of the drastic improvements in treatment options that would soon be available to HIV-infected patients.

7.    In performing life expectancy evaluations on 147 HIV-infected patients during the period from August 23, 1996 to January 6, 1999, Dr. Sanchez breached the standard of care for making life expectancy projections described above in paragraphs 5 and 6.

8.    Many of Dr. Sanchez's opinions would have underestimated life expectancy even if they had been made in an era before effective therapy (i.e., before July of 1996).

Respectfully submitted,

Dated September 16, 2005

Joel E. Gallant, MD, MPH

# 283595 PSO
012053-0002

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: PREMIUM ESCROW
SERVICES, INC., DEBTOR                          *

*      *      *      *      *      *            *

PREMIUM OF AMERICA, LLC,                        *

      Plaintiff                                *

        v.                                *

                                   CASE NO. 02-2358
William C. Sanchez, M.D.                        *      CHAPTER 11

      and                                     *      Adv. Proc. No.: 04-10455

William C. Sanchez, M.D., P.C.                  *

      Defendants                               *

*      *      *      *      *      *      *      *      *      *      *      *      *

### AFFIDAVIT OF ROBERT DEL COLLO

     I, Robert Del Collo, being over the age of 21 years, have personal knowledge of, and am competent to testify to, the matters set forth herein. I hereby certify as follows:

     1.    I am a member of the of Board of Managers of Premium of America, LLC ("POA"). I have served in this position since the creation of POA pursuant to the confirmation of the First Amended Plan of Reorganization in the above-referenced bankruptcy case.

     2.    Less than twenty-five percent (25%) of POA's members held interests in life insurance policies viaticated based on the life expectancy projections provided by William C. Sanchez, M.D. or William C. Sanchez, M.D., P.C ("Defendants").



EXHIBIT

C

3.     Based on the opinion of Joel E. Gallant, MD, MPH, that most experts believe that an HIV-infected person today, if adherent with therapy, can expect to live a full life span, ultimately dying of something other than AIDS, POA ceased paying premiums on policies viaticated by individuals infected with HIV. As premiums become due and are not paid, these policies will lapse. Thus, because of the inaccuracies of Defendants' life expectancy evaluations, the entire investments made on these policies will be lost. POA's damages expert Charles A. Black, C.P.A. projects that Defendants' negligence will result in damages to POA and its members in an amount exceeding $16 million.

[SIGNATURE PAGE TO FOLLOW]

I solemnly affirm under the penalties of perjury that the contents of the forego

Affidavit are true and correct to the best of my knowledge, information, and belief.

1 / 23 / 2006
Date

Robert Del Collo